<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KOBIR AHMED, | : Hon. Faith S. Hochberg, U.S.D.J. |
| | : |
| Plaintiff, | : Civil Case No. 11-683 (FSH) (PS) |
| | : |
| v. | : **OPINION** |
| | : |
| INTERSTATE MANAGEMENT COMPANY, | : Date: July 25, 2012 |
| | : |
| Defendant. | : |

<u>**HOCHBERG, District Judge**</u>:

This matter comes before the Court upon cross-motions for summary judgment pursuant to Fed. R. Civ. P. 56.  The Court has reviewed the submissions of the parties and considered the motions without oral argument pursuant to Fed. R. Civ. P. 78.

## I. BACKGROUND

### A. Procedural History

On October 15, 2010, plaintiff Kobir Ahmed ("Plaintiff") filed a Complaint against Sheraton Mahwah Hotel and ITT Sheraton Corporation in the New Jersey Superior Court, Essex County.  (Complaint, Ex. A to Not. of Removal, Feb. 7, 2011, ECF No. 1.)  On February 4, 2011, after the case was transferred to Passaic County, Plaintiff filed an Amended Complaint substituting defendant Interstate Management Company, LLC ("Defendant") for the original named defendants.  (Am. Compl., Ex. B. to Not. of Removal.)  The Amended Complaint set forth two causes of action: (1) sex, race, color, religion and national origin discrimination under

1

the New Jersey Law Against Discrimination ("NJLAD"); and (2) retaliation under the NJLAD.

(*Id.*) Both parties also explicitly note a separate claim for hostile work environment in the legal

issues section of the Final Pretrial Order and in their cross-motions for summary judgment.[1]

(Final Pretrial Order 43; Mot. Br. 20, Mar. 14, 2012, ECF No. 43; Opp'n Br. Apr. 23, 2012, ECF

No. 56.)

On February 7, 2011, Defendant removed the action to this Court pursuant to 28 U.S.C.

§ 1441, based upon diversity of citizenship under 28 U.S.C. § 1332(a)(1). (Not. of Removal 2.)

On March 14, 2011, Defendant filed its Answer to the Amended Complaint. (Answer, Mar. 14,

2011, ECF No. 14.) Discovery has been completed and the Final Pretrial Order has been

entered. (Final Pretrial Order, Apr. 18, 2012, ECF No. 58.)

On March 14, 2012, Defendant filed a Motion for Summary Judgment as to all claims in

the Amended Complaint, (Mot. for Summ. J., Mar. 14, 2012, ECF No. 42), along with a

memorandum in support, (Mot. Br.), a Statement of Material Facts pursuant to L. Civ. R. 56.1,

(56.1 Statement, Mar. 14, 2012, ECF No. 44), and supporting Declarations of Howard Wexler,

(Wexler Decl., Mar. 14, 2012, ECF No. 45), and Jeanette Rodriguez-Herrera, (Rodriguez-

Herrera Decl., Mar. 14, 2012, ECF No. 46).[2]

---

[1]    Although the Amended Complaint does not set forth a separate cause of action for hostile
work environment under the NJLAD, it alleges that Defendant "allowed and condoned a
workplace ridden with discriminatory intimidation, ridicule and insult that was so severe and
pervasive as to alter the conditions of Mr. Ahmed's employment; and which created an abusive
and hostile work environment."  (*Id.* ¶ 28.)

[2]    On April 23, 2012, Plaintiff filed a memorandum in opposition to Defendant's motion
and in support of his cross-motion for summary judgment, accompanied by a Counterstatement
of Material Facts pursuant to L. Civ. R. 56.1 and a supporting Declaration of Michael Schewe.
(Opp'n Br.)  Plaintiff separately filed the Cross-Motion for Summary Judgment on April 25,
2012. (Cross-Mot., Apr. 25, 2012, ECF No. 59.)  On May 11, 2012, Defendant filed a reply
memorandum in further support of its motion for summary judgment and opposition to
Plaintiff's cross-motion for summary judgment.  (Reply Br., May 11, 2012, ECF No. 60.)  On

### B. Factual History[3]

Plaintiff is a Bangladeshi male and practicing Muslim.  (Final Pretrial Order 3.)

Defendant owns and operates the Sheraton Hotel in Mahwah, New Jersey, where Plaintiff was

hired in or about October 1998.  (*Id.*)  Helen Johnston, a Human Resources department

employee, interviewed Plaintiff and was involved in the decision to hire him.  (*Id.*)  At the time

of Plaintiff's termination, his immediate supervisor was August Widito, the restaurant manager.

(56.1 Statement ¶ 9; 56.1 Counterstatement ¶ 9.)  His second level supervisor was Bob Trata, the

food and beverage director.  Kevin Wolford was the general manager of the hotel.  (*Id.*)

In 2002, Plaintiff took an approved leave of absence to travel to Bangladesh.  (Final

Pretrial Order 4.)  Plaintiff was scheduled to return to work from his trip on August 12, 2002, but

did not return until three to four weeks later.  (*Id.*)  Because Plaintiff did not return as scheduled,

his employment was terminated.  Defendant immediately rehired him when he again reported to

work, but he lost the seniority he had obtained between 1998 and 2002.  (*Id.*)

### 1.   Encounters with Co-workers

Plaintiff had encounters with several coworkers during his employment that had ethnic

overtones; he reported two incidents to Human Resources but not others.  Specifically, in 2002

or 2003, Plaintiff provided a statement that Jerry Thompson, another employee, had made an

inappropriate remark toward Plaintiff, calling him "Indian."  (*Id.* 6; Pl. Dep. 102:19-23; 110:15-

24, Ex. E to Schewe Supp. Decl.)  Johnston was informed of the incident, and Thompson

_____

May 24, 2012, the Court entered an Order requiring Plaintiff to file copies of all pages of
deposition transcripts upon which he relies in his Opposition Brief and Counterstatement of
Material Facts.  (Order, May 24, 2012, ECF No. 61.)  On May 29, 2012, Plaintiff submitted a
supplemental Declaration attaching the transcript pages.  (Schewe Supp. Decl., May 29, 2012,
ECF No. 62.)

[3]      For purposes of Defendant's motion for summary judgment, all disputed facts are viewed
in a light most favorable to Plaintiff.

received a verbal warning and did not refer to Plaintiff as "Indian" again.  (Final Pretrial Order 6; Pl. Dep. 102:19-25; 110:15-24.)  In 2007 or 2008, David Hortado, a cook, yelled at Plaintiff and called him "Indian" after Plaintiff cursed at Hortado.  (Pl. Dep. 129:17-131:21.)  After the incident, food and beverage director Bob Trata and the head chef took Plaintiff and Hortado to the chef's office and made them shake hands; Hortado received a verbal warning.  (Pl. Dep. 131:11-21; 131:25-132:5.)  At various times during Plaintiff's employment, plaintiff contends that bartender Mark Conca, beverage manager and nightclub manager Thomas Floody, and head bartender Spike McNamara called Plaintiff a "terrorist" and "Arab," but Plaintiff never complained about those incidents and instead tried to ignore it or change the subject.  (Pl. Dep. 87:23, 103:19-104:17, 109:17-110:10, 129:12, Ex. C to Wexler Decl.; Floody Dep. 35:3-6, Ex. G to Schewe Supp. Decl.)  Plaintiff asked Johnston to change his name tag to be less indicative of his Muslim faith; that request was denied.  (Pl. Dep. 101:22-102:1.)

### 2.  Complaints about Work Assignments and Pay

Plaintiff also complained about work assignments.  Specifically, Plaintiff testified that he complained to restaurant manager August Widito when Spike McNamara assigned preferential shifts to a woman named Libra.  (Pl. Dep. 126:13-129:13.)  On another occasion, after getting into an argument with food and beverage manager Trata, Trata told Widito to remove Plaintiff from the schedule so that he would not be assigned to work a preferential banquet shift and would instead work in the dining room.  (Pl. Dep. 29:14-30: 25, 133:3-7, 134:16-23.)  Plaintiff also testified that he complained about his pay.  (Pl. Dep. 29:20-31:2.)  Specifically, at an unidentified time, another employee, chief engineer Nestor Mena changed Plaintiff's pay rate in the computer system.  Plaintiff reported the incident, Mena was required to correct the pay rate

and apologize, and Plaintiff was compensated for the discrepancy in pay.  (Pl. Dep. 135:16-136:21.)

Plaintiff also claims that he was required to perform duties outside his ordinary job responsibilities such as bringing ice for the bartender when he was working at room service, taking room service orders when he was working in the restaurant, handling noise complaints and other security issues, and bringing batteries to the hotel rooms.  (Pl. Dep. 119:11-121.13; 160:22-163:7.)  Plaintiff contends that he was asked to perform tasks outside his job description more frequently than white or Hispanic employees.  (Pl. Dep. 120:21-121:13.)  Plaintiff also claims that beverage and nightclub manager Floody asked Plaintiff to tie Floody's shoelaces. (Pl. Dep. 160:22-163:7.)

Plaintiff also alleges that the other Muslim and darker-skinned employees were forced out of the hotel after September 11, 2001.  (Pl. Dep. 101:19-21; 105:23-106:18.)  Plaintiff claims that: (1) Defendant stopped using the Bangladeshi employment agency and switched to an agency with "white looking" Polish employees, (Pl. Dep. 108:5-109:11); (2) he and other Bangladeshi employees were required to work at positions beneath their level, such as busboy instead of waiter, on holidays, (Pl. Dep. 105:2-106:18; 123:10-125:3); (3) Bangladeshi employees were not given preferential shifts, (Pl. Dep. 106:3-18); (4) lighter-skinned employees were kept in positions where they would be more visible to guests, (Pl. Dep. 125:4-7); and (5) another Bangladeshi employee was forced to perform tasks such as throwing salt outside on a snow day and cleaning a supervisor's car.  (Pl. Dep. 106:20-23; 118:6-119:10.)

### 3.  Incident With a Guest

On or about July 18, 2009, hotel guest Aaron Gross ordered a sandwich from the hotel bar, where Plaintiff was working as a bartender.  (Final Pretrial Order 4.)  Plaintiff delivered the

5

sandwich to Gross in the Sheraton Link, a computer facility available to hotel guests.  (*Id.*)

Plaintiff explained to Gross that eating was not permitted in the Sheraton Link, and Gross

responded that he would not eat there and was just going to check his email.  (*Id.*)  When

Plaintiff returned a short time later, he discovered that Gross was eating his sandwich in the

Sheraton Link and again told Gross that eating was not permitted.  (*Id.*)  Gross insisted that he be

permitted to finish his sandwich, and a dispute ensued, during which Plaintiff alleges that Gross

acted in a "very aggressive" manner, cursed, and hit Plaintiff on the left wrist with a leather

billfold.  (*Id.*; 56.1 Statement ¶¶ 20, 21; 56.1 Counterstatement ¶¶ 20, 21.)  While both Gross and

Plaintiff were attempting to speak with restaurant manager Widito, Plaintiff alleges that Gross

referred to him as a "bastard" and pointed at him.  (Final Pretrial Order 4.)  Plaintiff screamed

"don't curse me" and "I'm not going to take any more crap from you" and then used two hands

to push Gross away.  (*Id.*)  Widito then directed Plaintiff to Human Resources, where Johnston

asked Plaintiff to go home for the day pursuant to hotel policy.  (*Id.*)  Plaintiff was placed on

suspension while Defendant investigated these events (the "Gross incident").  (*Id.*)

     After the incident, Gross filed a report with the Mahwah Police Department, and Plaintiff

subsequently filed his own report.  (*Id.* 5.)  Gross also filed a civil suit against the hotel and

received a financial settlement.  (*Id.*)  Defendant conducted an investigation into the Gross

incident and took written statements from Plaintiff, Widito, and Gross.  (*Id.*)  Johnston and the

hotel's general manager, Wolford, together made the decision to terminate Plaintiff's

employment.  (*Id.*)  Approximately five days after the incident, on or about July 23, 2009,

Plaintiff met with Johnston and Wolford, who together informed Plaintiff that his employment

was terminated for violation of the hotel's Workplace Violence Policy, which provides, in

relevant part:

> Interstate expressly prohibits any acts or threats of violence by any Interstate associate . . . in or around Interstate facilities, or elsewhere, at any time.  Interstate also prohibits any acts or threats of violence against guests, vendors, visitors or other persons on Interstate property at any time or while they are engaged in business with or on behalf of Interstate.

(*Id.* 3, 5.)  The Workplace Violence Policy states that "[i]f the Company determines that workplace violence has occurred, the Company will take appropriate corrective action and may impose discipline on offending associates, up to and including termination."  (56.1 Statement ¶ 3; 56.1 Counterstatement ¶ 3.)

### 4.  Comparator Incident

Plaintiff presented evidence of another episode of workplace violence that had a different outcome for the employees involved.  On or about November 29, 2008, Plaintiff was working as a bartender at the hotel and served hotel guest Jay Zaretsky.  (Final Pretrial Order 5.)  Plaintiff witnessed an inebriated Zaretsky behaving inappropriately by offering champagne to two female guests, touching those guests, and trying to lean on their chests.  (*Id.*)  Plaintiff called security and was directed to stop serving Zaretsky alcohol.  (*Id.* 5-6.)  Zaretsky became angry, knocked over glass pitchers, demanded to see a manager, and went to the hotel's front desk.  (*Id.* 6.)  At the front desk, Zaretsky shouted obscenities at Floody and lunged to swing at him.  (*Id.*; Conca Dep. 23, 28-33, Ex. F to Schewe Supp. Decl.; Floody Dep. 55-58, Ex. G to Schewe Supp. Decl.)  Floody, Conca, and/or David Martorano then took Zaretsky to the ground and restrained him.  (Final Pretrial Order 6; Conca Dep. 23, 28-33; Floody Dep. 55-58.)  The Mahwah Police Department responded to the incident and arrested Zaretsky.  (Final Pretrial Order 6.)  Floody, Conca, and Mortorano were not disciplined in connection with these events (the "Zaretsky incident").  (*Id.*)

7

**II. LEGAL STANDARD**

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, "[s]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).  All facts and inferences must be construed in the light most favorable to the non-moving party.  *Peters v. Del. River Port Auth.*, 16 F.3d 1346, 1349 (3d Cir. 1994).  The judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  "Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 860 (3d Cir. 1990).

The party seeking summary judgment always bears the initial burden of production. *Celotex*, 477 U.S. at 323.  This burden requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or demonstrate that the nonmoving party has not shown the requisite facts relating to an essential element of an issue on which it bears the burden.  *Id.* at 322-23.  Once the party seeking summary judgment has carried this initial burden, the burden shifts to the nonmoving party.

To avoid summary judgment, the nonmoving party must then demonstrate facts supporting each element for which it bears the burden, and it must establish the existence of a

"genuine issue of material fact" justifying trial.  *Miller*, 843 F.2d at 143; *accord Celotex*, 477 U.S. at 324.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  Further, summary judgment may be granted if the nonmoving party's "evidence is merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III. DISCUSSION

### A.  Employment Discrimination

The NJLAD provides that it is unlawful "[f]or an employer, because of the race, creed, color, [or] national origin . . . of any individual . . . to discharge . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . ."  N.J.S.A. 10:5-12(a).  On a motion for summary judgment on an NJLAD discrimination claim without direct evidence of discrimination, the Court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Jakimas v. Hoffman-la Roche, Inc.*, 485 F.3d 770, 788 (3d Cir. 2007).  Thus, the plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) he belongs to a protected class; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999); *Taylor v. Amcor Flexibles Inc.*, 669 F. Supp. 2d

9

501, 506 (D.N.J. 2009).  If the plaintiff establishes a *prima facie* case, the burden of production

shifts to the defendant to provide a "legitimate, nondiscriminatory reason" for the termination.

*McDonnell Douglas*, 411 U.S. at 802; *see also Taylor*, 669 F. Supp. 2d at 506.  If the defendant

articulates a legitimate, nondiscriminatory reason, the burden returns to the plaintiff to show that

the defendant's proffered reason or reasons are pretextual.  *McDonnell Douglas*, 411 U.S. at 804-

05; *Taylor*, 669 F. Supp. 2d at 506.

### 1.  *Prima Facie* Case

Defendant does not dispute that the first three elements of the *prima facie* case are

satisfied; namely, that Plaintiff belongs to a number of protected classes, that Plaintiff was

performing his job at an acceptable level, and that Plaintiff suffered an adverse employment

action.  (Final Pretrial Order 3-4; 56.1 Statement ¶¶ 5, 14, 15, 32, 33.)  Defendant does, however,

dispute whether there exists a material issue of fact as to the fourth element, namely that

similarly situated employees who are not members of the protected classes were not subjected to

termination or that the adverse employment action otherwise occurred under circumstances

giving rise to an inference of discrimination.  (Mot. Br. 6-10.)  The Court need not decide

whether there exists an issue of material fact as to whether Plaintiff's termination occurred under

circumstances giving rise to an inference of discrimination because even if a reasonable jury

could conclude that Plaintiff has established a *prima facie* case, no reasonable jury could find

Defendant lacked a legitimate, nondiscriminatory reason for Plaintiff's termination or that

Defendant's proffered reason is pretextual.

### 2.  Legitimate, Nondiscriminatory Reason

Assuming *arguendo* that Plaintiff has established a *prima facie* case, the burden of

production shifts to Defendant to introduce "evidence which, taken as true, would permit the

conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)). "The employer need not prove that the tendered reason *actually* motivated its behavior . . . ." *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)) (emphasis in original).

Defendant's proffered justification for Plaintiff's termination is Plaintiff's involvement in a physical altercation with a hotel guest in violation of Defendant's Workplace Violence Policy. (56.1 Statement ¶ 32; Mot. Br. 10.)  It is undisputed that such an altercation occurred, (56.1 Statement ¶ 23; 56.1 Counterstatement ¶ 23), and such violence or even the threat of violence constitutes a legitimate, nondiscriminatory reason for termination.  *See Exantus v. Harbor Bar & Brasserie Rest.*, 386 F. App'x 352, 355 (3d Cir. 2010) (stating that "violence in the workplace is clearly a legitimate, nondiscriminatory reason for terminating an employee"); *see also Holland v. Macerich*, Civ. No. 09-914, 2011 WL 6934969, at *4 (D.N.J. Dec. 29, 2011) (finding "argumentative and threatening behavior" a legitimate justification under the NJLAD). Consequently, Defendant has met its burden of articulating a legitimate, nondiscriminatory reason for Plaintiff's termination, and the burden returns to Plaintiff to show that the stated reason is pretextual.

### 3.  Pretext

On a motion for summary judgment where

> the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Fuentes*, 32 F.3d at 764 (citations omitted).  In other words, the "evidence rebutting the

employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of

the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or

otherwise did not actually motivate the employment action (that is, the proffered reason is a

pretext)."  *Id.* (citations omitted and emphasis in original); *see also Swider v. Ha-Lo Indus., Inc.*,

134 F. Supp. 2d 607, 627 (D.N.J. 2001).  The plaintiff "must demonstrate such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy

of credence and hence infer that the employer did not act for [the asserted] non-discriminatory

reasons."  *Fuentes*, 32 F.3d at 765 (internal quotation marks and citations omitted; emphasis and

alteration in original).

     Plaintiff argues that Defendant's stated reason for Plaintiff's termination is pretextual

because: (1) similarly situated employees outside Plaintiff's protected classes retained their jobs,

while Plaintiff's employment was terminated, (Opp'n Br. 15); and (2) other events show an

ongoing effort to "force out the Bangladeshi employees."  (*Id.* 15-18.)

### a.  Comparators

     As to Defendant's treatment of similarly situated employees, Plaintiff argues that his

treatment following the Gross incident was different from the treatment of Conca, Floody, and

Martorano following the Zaretsky incident.  It is undisputed that Plaintiff was terminated while

Conca, Floody, and Martorano retained their jobs.  (Final Pretrial Order 6.)  The facts of the

Gross and Zaretsky incidents, however, are insufficiently comparable for a reasonable jury to

find Plaintiff "similarly situated" to Conca, Floody, and Martorano.  For Conca, Floody, and

Martorano to serve as comparators, they "must have engaged in the same conduct without such

differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." *Davis v. City of Phila. Water Dep't*, 57 F. App'x 90, 92 (3d Cir. 2003) (internal quotation marks and citation omitted).  In comparing the two incidents, the "focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 359 (3d Cir. 1999) (citation omitted).

Viewing the record in the light most favorable to the Plaintiff, the facts of the Gross and Zaretsky incidents differ too significantly for a reasonable jury to consider Conca, Floody, or Martorano valid comparators.  First, it is undisputed that Zaretsky was intoxicated while Gross was not.  (56.1 Statement ¶ 53; 56.1 Counterstatement ¶ 53.)  Second, it is undisputed that Zaretsky had been physically destructive and had verbally and physically harassed other hotel guests, while Gross had not.  (56.1 Statement ¶¶ 20, 37, 39; 56.1 Counterstatement ¶¶ 20, 37, 39.)  Third, although Plaintiff notes that Conca's and Floody's recollections of the Zaretsky incident differ in some respects, it is undisputed that Zaretsky initiated physical contact with Conca, Floody, and possibly Martorano; in contrast, although Gross allegedly hit Plaintiff on the wrist with a leather billfold while in the Sheraton Link, (Final Pretrial Order 4; 56.1 Statement ¶¶ 20, 21; 56.1 Counterstatement ¶¶ 20, 21), it is undisputed that at a separate location thereafter, Plaintiff initiated physical contact with Gross.  (56.1 Statement ¶¶ 22, 23, 45, 49; 56.1 Counterstatement ¶¶ 22, 23, 45, 49.)  Fourth, it is undisputed that Conca, Floody, and possibly Martorano merely restrained Zaretsky by bringing him to the ground and holding him there until the police arrived; at a minimum, Plaintiff pushed Gross.[4]  (56.1 Statement ¶¶ 23, 45, 49; 56.1

---

[4]    Other evidence in the record suggests that Plaintiff may have punched Gross in the face. (56.1 Statement ¶¶ 29-31; 56.1 Counterstatement ¶¶ 29-31.)  The Court assumes to be true the

Counterstatement ¶¶ 23, 45, 49.)  Fifth, it is undisputed that the Mahwah Police Department subsequently arrested Zaretsky for his conduct; Gross was not arrested and in fact, subsequently filed a police report as a complainant and a civil complaint against the hotel.  (56.1 Statement ¶ 35, 53; 56.1 Counterstatement ¶ 35, 53.)  Given these undisputed facts concerning each of the incidents and the significant differences between them, these two encounters cannot be described as substantially similar.

Plaintiff repeatedly argues that Defendant's Workplace Violence Policy "contains no exceptions," (*see, e.g.*, Opp'n Br. 10, 11, 13), and thus insists that Defendant executed the policy "in a preferential and discriminatory way" by terminating Plaintiff while retaining Conca, Floody, and Martorano.  (*Id.* 14.)  To the contrary, the policy states that "[i]f the Company determines that workplace violence has occurred, the Company will take appropriate corrective action and *may* impose discipline on offending associates, *up to* and including termination." (56.1 Statement ¶ 3; 56.1 Counterstatement ¶ 3 (emphasis added).)  The plain text of the policy gives Defendant's managers the discretion to assess instances of workplace violence on an individual basis and impose appropriate discipline.  Thus, Plaintiff's insistence that Defendant had no choice but to terminate Conca, Floody, and Martorano pursuant to the policy is meritless. Defendant was within its discretion to terminate Plaintiff while retaining the other employees, particularly given the undisputed factual differences between Plaintiff's actions and the actions of Conca, Floody, and Martorano.  *See Greenawalt v. Clarion Cty.*, 459 F. App'x 165, 168-69 (3d Cir. 2012) (affirming grant of summary judgment, in part for failure to present evidence of pretext, because the employer defendant "was well within its discretion in treating [the employee

---

facts more favorable to Plaintiff, namely that Plaintiff pushed Gross rather than punched him. Nonetheless, the Court finds a push or a shove insufficiently similar to restraint of an inebriated leering or groping guest to render Conca, Floody, or Martorano valid comparators.

14

plaintiff's] case differently than those of his comparators" and agreeing with the District Court that the employer's determination that the plaintiff "committed a sufficiently egregious offense worthy of termination was such that a fact-finder could not reasonably infer that [his] termination was a post hoc fabrication, or that [his protected characteristics] motivated" the termination); *Dunlap v. Merritt Hospitality*, Civ. No. 08-2019, 2009 WL 737372, at *6-7 (E.D. Pa. Mar. 18, 2009) (granting summary judgment, in part for failure to present evidence of pretext, where one hotel employee "was an active aggressor" while his proffered comparator "wrestled an individual to the ground"); *see also Gazarov v. Diocese of Erie*, 80 F. App'x 202, 206 (3d Cir. 2003) (affirming grant of summary judgment because even where the plaintiff "assert[s] a subjective belief that another's behavior is more serious, . . . unless it is the *same* conduct as the plaintiff's, the supposedly more serious act by the comparator is irrelevant") (emphasis in original).

Moreover, "[w]hile identification of one or two comparators may be sufficient at the prima facie stage of analysis, it is not sufficient at the pretext phase." *Ray v. Pinnacle Health Hospitals, Inc.*, 416 F. App'x 157, 164 (3d Cir. 2010) (citing *Simpson v. Kay Jewelers*, 142 F.3d 639, 645-46 (3d Cir. 1998)). Thus, even if Conca, Floody, and/or Martorano were valid comparators, Plaintiff would need to offer additional evidence that could lead a jury to conclude that the stated reason for his termination is pretextual to sustain his burden under the *McDonnell Douglas* framework. He has failed to do so.

### b. Past Treatment

The other events in the workplace that Plaintiff described do not provide facts from which a reasonable jury could infer that the proffered reason for the termination was pretextual. Plaintiff argues that events beyond the Zaretsky incident demonstrate an ongoing effort to "force out the Bangladeshi employees," (Opp'n Br. 15-18), and show that Defendant's stated reason for

Plaintiff's termination is pretextual.  (*Id*. 33.)  In essence, Plaintiff argues that after September

11, 2001, Defendant began a "crusade" to force out certain employees, that Plaintiff's

termination was consistent with that "crusade," and that evidence of Plaintiff's past treatment at

work could lead a reasonable jury to conclude that ethnicity, not Plaintiff's altercation with a

guest, caused his termination.  (*Id.* 2.)  Specifically, Plaintiff points to portions of his own

deposition describing instances in which: (1) other hotel employees used racial epithets like

"Arab," "Indian," or "terrorist," (*id.* 16 (citing Pl. Dep. 102:19-20; 109:17-110:14; 110:19-21;

117:10-118:5); (2) Plaintiff was required to perform duties outside his ordinary job

responsibilities, (*id.* (citing Pl. Dep. 119:10-121:3; 143:10-24; 160:22-163:7)); (3) Bangladeshi

employees were given undesirable positions and/or schedules, (*id.* 16 (citing Pl. Dep. *passim*));

(4) Plaintiff was denied permission to use a "fake" name, (*id.* 17 (citing Pl. Dep. 101:13-102:4));

(5) another hotel employee changed Plaintiff's pay rate in the hotel system, (*id.* 17 (citing Pl.

Dep. 135:4-136:10)); and (6) Plaintiff was terminated after failing to return to work after a 2002

vacation to Bangladesh, but was rehired with a loss of his accumulated seniority when he

returned to work two or three weeks later. (*id.* 18 (citing Pl. Dep. 40:20-41:13).

   Accepting all of these allegations as true, they nonetheless do not provide a sufficient

basis upon which a reasonable jury could infer that the Gross incident was a "*post hoc*

fabrication or otherwise did not actually motivate the employment action." *Fuentes*, 32 F.3d at

764.  Plaintiff's argument would require a jury to conclude that for nearly eight years, from

September 11, 2001, until July 18, 2009, Defendant attempted to force Plaintiff out of his job, all

the while giving Plaintiff positive performance reviews and recommending him for other

positions.  (56.1 Statement ¶ 14; 56.1 Counterstatement ¶ 14; Ex. F to Wexler Decl. (describing

Plaintiff in 2002 as a "flexible" and "multi-talented" employee with "excellent" or "good"

ratings in all but one category—leadership); Ex. G to Wexler Decl. (describing Plaintiff in 2003 as a "very good" and "dependable" employee who "meets standard" in all categories); Ex. H. to Wexler Decl. (recommending Plaintiff for employment in 2004 and stating that he "has always come up to the task at hand"); Ex. I to Wexler Decl. (recommending Plaintiff for employment in 2004 as "an asset to our company as a capable employee and a hard worker"); Ex. J to Wexler Decl. (recommending Plaintiff for employment in 2008 as "a valuable full-time associate in excellent standing").)  The duration of Plaintiff's employment, his positive reviews, and the nature of his physical encounter with Gross make implausible the notion that Defendant used the Gross incident as a pretext.  *See Brokenbaugh v. Exel Logistics N. Am., Inc.*, 174 F. App'x 39, 46 (3d Cir. 2006) (stating that if the "managers had been burdened with the discriminatory animuses [the plaintiff] claims, one would expect that he would have been terminated long before").

Plaintiff's argument would also require a jury to conclude that when Johnston and Wolford terminated Plaintiff a mere five days after the Gross incident, they were motivated not by the facts of the incident, but by their preexisting discriminatory animus dating back eight years.  That conclusion would be plainly inconsistent with Plaintiff's admission that "[a]s a result of the [Gross incident] investigation, and in reliance on the witness statements collected, Johnston and Wolford together made the decision to terminate Plaintiff's employment *because* his conduct was a clear violation of the Workplace Violence Policy."  (56.1 Statement ¶ 32; 56.1 Counterstatement ¶ 32 (emphasis added).)  That admission underscores Plaintiff's inability to meet his burden of proving that the Gross incident was a pretext for his termination.

Moreover, Johnston and Wolford made their decision after reviewing witness statements indicating that Plaintiff punched Gross in the face.  (56.1 Statement ¶¶ 29-30; 56.1 Counterstatement ¶¶ 29-30.)  Even if those witness statements were inaccurate, Defendant's

17

representatives reasonably relied upon them in making the termination decision.  That Johnston's and Wolford's reliance may have been misplaced is not a sufficient ground to find that Plaintiff's termination was discriminatory.  *See Zangara v. Somerset Med. Ctr.*, No. L-1039-08, 2011 WL 4577335, at *13 (N.J. Super. App. Div. Oct. 5, 2011) (stating that "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent") (quoting *Fuentes*, 32 F.3d at 765).

Consequently, no reasonable jury could conclude, on the basis of Plaintiff's prior treatment at work, that Defendant concocted the reason for Plaintiff's termination after the fact or that the Gross incident did not cause Defendant to terminate Plaintiff.  Thus, even assuming that Plaintiff had been able to establish a *prima facie* case of discriminatory termination under the NJLAD, Defendant has articulated a legitimate, nondiscriminatory reason for Plaintiff's termination and Plaintiff has failed to meet his burden to show that the stated reason was pretextual.  Because no reasonable jury could conclude, even viewing the facts in a light most favorable to Plaintiff, that the Gross incident was a pretext for Plaintiff's termination, summary judgment is granted for Defendant as to Count One.

### B.  Retaliation

The NJLAD provides that it is unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under [the NJLAD] or because that person has filed a complaint."  N.J.S.A. 10:5-12(d).  On an NJLAD retaliation claim, the Court applies the *McDonnell Douglas* burden-shifting framework.  S*ee Cottrell v. Good Wheels*, 458 F. App'x 98, 100-01 (3d Cir. 2012); *Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 937 (3d Cir. 2009).  Thus, for a claim of retaliation, "a plaintiff must show that: (1) he or

she engaged in protected conduct known to the defendant; (2) he or she was subjected to an adverse employment decision; and (3) there was a 'causal link' between the protected activity and the adverse decision."  *Marrero v. Camden Cty. Bd. of Social Serv.*, 164 F. Supp. 2d 455, 472-73 (D.N.J. 2001); *see also Cottrell*, 458 F. App'x at 100; *Victor v. State*, 203 N.J. 383, 409 (2010).  If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to "articulate a 'legitimate, non-retaliatory reason for the action.'"  *Marrero*, 164 F. Supp. 2d at 473 (quoting *Shepherd v. Hunterdon Developmental Ctr.*, 336 N.J. Super. 395, 418 (App. Div. 2001)).  If the defendant articulates a legitimate, non-retaliatory reason, the burden returns to the plaintiff to "demonstrate that a retaliatory intent motivated the defendants."  *Id.* (citing *Shepherd*, 336 N.J. Super. at 418).

Thus, to obtain summary judgment in its favor, "the employer must show that the trier of fact could not conclude, as a matter of law, (1) that retaliatory animus played a role in the employer's decisionmaking process *and* (2) that it had a determinative effect on the outcome of that process."  *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997) (emphasis added).  According to *Krouse*,

> this may be accomplished by establishing the plaintiff's inability to raise a genuine issue of material fact as to either: (1) one or more elements of the plaintiff's prima facie case or, (2) if the employer offers a legitimate non-retaliatory reason for the adverse employment action, whether the employer's proffered explanation was a pretext for retaliation.

*Id.* (citations omitted).

### 1.  *Prima Facie* Case

At the summary judgment stage, a plaintiff meets his initial burden if he shows that "the proffered evidence, looked at as a whole . . . suffice[s] to raise the inference" of a causal connection between protected activity and an adverse employment action.  *Kachmar v. SunGard*

19

*Data Sys. Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).  In this context, protected activity includes

"oppos[ing] any practice made unlawful by [LAD]" or when an individual "has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or litigation"

regarding "discrimination against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such an individual's [protected

characteristic]."  *Barber v. CSX Distrib. Servs.,* 68 F.3d 694, 701-02 (3d. Cir. 1995) (citations

omitted); *see also Fabrikant v. Arthur J. Gallagher & Co. et al.*, No. L-4417-04, 2008 WL

281690 at *7-8 (N.J. Super Ct. App. Div. Feb. 4, 2008).  With respect to a causal link, courts

have "focused on the temporal proximity between the employee's protected activity and the

adverse employment action," but "where there is a lack of temporal proximity, circumstantial

evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the

inference."  *Kachmar*, 109 F.3d at 177 (quoting *Robinson v. Southeastern Pa. Transp. Auth.*, 982

F.2d 892, 895 (3d Cir. 1993)).  Thus, if "the temporal proximity is not so close as to be unduly

suggestive" of retaliation, "timing plus other evidence may be an appropriate test."  *Williams v.

Philadelphia Housing Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (internal quotation

marks and citations omitted).

Plaintiff's entire argument concerning a *prima facie* case of retaliation contains two

citations to the record.  The first is a citation to paragraphs 14 and 15 of Defendant's 56.1

Statement, which state that Plaintiff received positive reviews and letters of recommendation.

(Opp'n Br. 20 (citing 56.1 Statement ¶¶ 14, 15).)  That Plaintiff received positive reviews and

letters of recommendation after lodging one or more complaints about his coworkers' actions

weighs *against* an inference that Plaintiff's eventual termination was retaliatory.  *See Elmiry v.

Wachovia Corp.*, Civ. No. 04-3621, 2007 WL 4117260, at *12 (D.N.J. Nov. 16, 2007) (granting

20

summary judgment as to a retaliation claim where "[n]o conduct of [the plaintiff's supervisor] in the interim suggests any animus.  In fact, plaintiff got a positive annual review, receiving a 'Meets Expectations' overall rating subsequent to the incident.").

The second is a citation to page 149 of Plaintiff's deposition transcript, (Opp'n Br. 19), which reads:

> Q.      You said you didn't want to complain to Human Resources or to any of your supervisors because you were afraid you're going to be fired, correct?
> A.      Correct.
> Q.      But the one time that you did get Human Resources involved with Helen Johnston, you know, with Jerry Thompson nothing bad happened to you?
> A.      No.
> Q.      So, I want to understand why do you believe you were going to be fired if you did complain to Human Resources?
> A.      Because the other people you, like, they call me names.  They call me names, they call me terrorists every week.  So, how many times do you think I should go over there and tell them.  Every time they call me you terrorists, so I should go over there and tell them.  I don't think so because how many times somebody going to hear me then saying the same thing over and over.  So this is why I just kept it inside to myself.
> Q.      But you didn't even tell them once?
> A.      No.

(Pl. Dep. 148:24-149:21.)  On this record, which reflects just one complaint to Human Resources, there is no factual basis to support Plaintiff's argument that he made "*constant complaints of discrimination over his decade of employment with the Sheraton [that] were the catalyst leading to his termination.*"  (Opp'n Br. 20 (emphasis added).)

Looking beyond these two citations, a review of the entire record shows two other complaints and responses thereto, namely that: (1) in around 2007 or 2008, Hortado yelled at Plaintiff and called him "Indian" after Plaintiff cursed at Hortado, (Pl. Dep. 129:17-131:21); after the incident, Food and Beverage Director Trata and the chef took the two of them to the chef's office and made them shake hands, and Hortado received a verbal warning, (Pl. Dep. 131:11-21,

131:25-132:5); and (2) at an unidentified time chief engineer Mena changed Plaintiff's pay rate in the computer system but once Plaintiff reported the incident to Human Resources, Mena was forced to correct the pay rate and apologize to Plaintiff and Plaintiff was compensated for the week that he reported the error.  (Pl. Dep. 135:6-136:21).  Thus, after each complaint to a supervisor, once in 2002 or 2003, once in 2007 or 2008, and once at an unidentified time, management reprimanded the offending employee and the offending conduct ceased, (*see* Pl. Dep. 102:23-25, 131:11-21, 131:25-132:5), and there is no evidence to show Plaintiff was negatively impacted as a result of his complaints.

Plaintiff also testified that Conca, Floody and McNamara called him a "terrorist" and "Arab" a "lot of times" but he never complained to anyone and instead tried to ignore the comments or change the subject because he thought such complaints would be futile or because he feared retaliation.  (Pl. Dep. 103:19-104:17, 109:17-110:10.)  Such a fear "does not obviate the requirement for protected activity."  *Chambers v. Heidelberg USA, Inc.*, Civ. No. 04-583, 2006 WL 1281308, at *10 (D.N.J. May 5, 2006) (finding that the plaintiff had not engaged in protected activity when he never complained of discrimination prior to his termination even though he alleged his failure to report was based on fear of retaliation).  Additionally, while Plaintiff alleges he feared he would be fired for complaining, he admits that no one told him such action was a possibility and his earlier complaints about ethnic remarks were addressed without repercussion.  (Pl. Dep. 147:24-149:21.)  *See Chambers*, 2006 WL 1281308, at *10 n.6 (finding lack of protected activity when plaintiff contended he feared retaliation but admitted he did not know of any prior incidents of retaliation and knew of his employer's anti-harassment policy).

Plaintiff further testified that he complained to Widito when McNamara gave a woman named Libra the best shifts based on McNamara's personal relationship with her (Pl. Dep.

126:13-129:13).  Complaints of preferential treatment based upon a personal relationship are not

protected under NJLAD and thus cannot provide a basis for relief.  *See Stewart v. Cty. of

Hudson*, No. L-3579-07, 2011 WL 2935042 at *11 (N.J. Super Ct. App. Div. July 22, 2011)

(citation omitted) (finding that although plaintiff submitted complaints, since they were not

"couched in terms of LAD based membership," there was no protected activity); *Sunkett v.

Misci*, 183 F. Supp. 2d 691, 719 (D.N.J. 2002); *Dungee v. Northeast Foods, Inc.*, 940 F. Supp.

682, 689 (D.N.J. 1996).

       As a whole, the record shows that Plaintiff complained sporadically about treatment by

his coworkers between 2002 and 2008.  Plaintiff was terminated at least a year after the last

instance of protected activity he cites, but merely five days after the Gross incident Defendant

cites as the sole reason for Plaintiff's termination.  There are thus no facts upon which a

reasonable jury could find temporal proximity between Plaintiff's protected activity and his

termination.  *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004)

(finding a lapse of two months between protected activity and employment action not "unduly

suggestive" of retaliation); *Levins v. Braccia*, No. L-2980-06, 2009 WL 1658610, at *7 (N.J.

Super. App. Div. June 16, 2009) (finding a lapse of four months between confrontation with

supervisor and termination insufficient to support causal connection).

       The absence of facts upon which temporal proximity could be found weighs against an

inference of causal connection, and Plaintiff here has not demonstrated the "pattern of

antagonism" necessary to support such an inference when no temporal proximity exists.

*Kachmar*, 109 F.3d at 177.  The record shows that management almost always responded to

Plaintiff's complaints and caused the objectionable conduct to cease,[5] that the managers did not engage in the objectionable conduct about which he complained, and that Plaintiff received positive reviews after complaining.  Rather than a pattern of antagonism, the record demonstrates that Defendant's managers took steps to remedy issues Plaintiff raised by imposing discipline on intolerant employees.  Thus, no reasonable jury could conclude, on the record presented, that retaliatory animus played a role in Defendant's decisionmaking process *or* that retaliatory animus had a determinative effect on the outcome of that process.  The only reasonable inference is that Plaintiff was terminated, five days after the Gross incident, for his involvement in that incident.  Consequently, Plaintiff has failed to meet his burden to establish a *prima facie* case of retaliation.

### 2.  Legitimate, Non-retaliatory Reason

For the reasons discussed in Section III.A.2 *supra*, Defendant has articulated a legitimate reason for Plaintiff's termination that is neither discriminatory nor retaliatory—his physical altercation with a hotel guest, Aaron Gross.  Thus, even if Plaintiff had established a *prima facie* case of retaliation, the burden would return to Plaintiff to show that a reasonable jury could conclude that a retaliatory intent motivated Defendant.

### 3.  Pretext

In arguing that Defendant's stated reason for termination is a pretext for retaliation, Plaintiff merely incorporates by reference his argument that the stated reason for termination is a pretext for discrimination.  For the reasons discussed in Sections III.A.3 and III.B.1 *supra*, no

---

[5]      Plaintiff testified that he requested to change his name tag to be less indicative of his Muslim faith, and that request was denied.  (Pl. Dep. 101:22-102:1.)  Plaintiff does not, however, identify any other instance in which a request to change a name tag was granted.  While not a complaint about a particular person's behavior, this is the only instance in the record where Plaintiff allegedly sought relief from hotel management and that relief was denied.

reasonable jury could conclude, on the evidence presented, that Defendant's stated reason for Plaintiff's termination is a pretext for retaliation.  Plaintiff has not provided evidence that a similarly situated comparator was treated differently, nor is Plaintiff's treatment at work indicative of retaliatory motive.  Even after he complained, he received positive performance evaluations and so much time passed between his last complaint and termination that no reasonable jury could conclude this termination was because of his complaints and not his physical contact with Gross.  Thus, even if Plaintiff had established a *prima facie* case of retaliation, summary judgment for Defendant is appropriate because Defendant has articulated a legitimate, non-retaliatory reason for Plaintiff's termination that Plaintiff has failed to rebut. Consequently, summary judgment is granted for Defendant as to Count Two.

### C.  Hostile Work Environment

To establish an NJLAD claim for hostile work environment, the plaintiff must show that "the complained-of conduct (1) would not have occurred but for the employee's [protected characteristic]; and it was (2) severe or pervasive enough to make a (3) reasonable [person in plaintiff's protected class] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive."  *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 114 (3d Cir. 1999) (citing *Lehmann v. Toys R Us, Inc*., 132 N.J. 587, 603-04 (1993)).

Viewing the relevant facts in the light most favorable to Plaintiff, the record shows that: (1) Defendant hired Plaintiff around October 1998, (Final Pretrial Order 3); (2) in 2002, Plaintiff was terminated when he failed to return to work as scheduled from his approved leave of absence, (*id.* 4); (3) Plaintiff was immediately rehired when he eventually reported to work but lost the seniority he had accrued between 1998 and 2002, (*id.*); (4) in 2002 or 2003, Plaintiff complained to Human Resources that Thompson had called Plaintiff "Indian," (*id* 6); (5)

Thompson was given a verbal warning and did not refer to Plaintiff as "Indian" again, (*id.*); (6) bartender Conca, beverage and nightclub manager Floody, head bartender McNamara, and cook Hortado, none of whom were Plaintiff's manager or supervisor at the time of his termination, (56.1 Statement ¶9, 56.1 Counterstatement ¶9), referred to him as "Indian," "terrorist," and "Arab" over the course of his employment, (56.1 Statement ¶¶ 54-60; 56.1 Counterstatement ¶¶ 54-60), but he never complained to anyone about these comments, (Pl. Dep. 103:19-104:17, 109:17-110;10, 147:21-149:21); (7) in 2007 or 2008, cook Hortado yelled at Plaintiff and called him "Indian" after Plaintiff cursed at Hortado, and Hortado subsequently received a verbal warning, (Pl. Dep. 131:11-21; 131:25-132:5); and (8) after getting into an argument with his second level supervisor Trata, Trata told Plaintiff's immediate supervisor, Widito, to remove Plaintiff from the banquet schedule.  (Pl. Dep. 29:14-30: 25, 133:3-7, 134:16-23.)

Plaintiff also testified: (1) that the other Muslim and darker-skinned employees were forced out of the hotel after September 11, 2001, (Pl. Dep. 101:19-21; 105:23-106:18); (2) that he requested a name tag that did not contain his last name so that it would not be as obvious that he was Muslim, but the request was denied, (Pl. Dep. 101:23-102:1); (3) that Bangladeshi employees were forced out because they were not given preferential shifts, (Pl. Dep. 105:2-106:18); (4) that another Bangladeshi employee was forced to perform tasks such as throwing salt outside on a snow day and cleaning a supervisor's car because he was Bangladeshi, (Pl. Dep. 106:20-23; 118:6-119:10); (5) that Defendant stopped using the Bangladeshi employment agency and switched to an agency with "white looking" employees, (Pl. Dep. 108:5-109:11); (6) that Plaintiff was asked to perform tasks outside his job responsibilities more frequently than white or Hispanic employees, (Pl. Dep. 119:11-121:13; 160:24-163:7); (7) that white and Hispanic employees were given better shifts, (Pl. Dep. 121:14-123:9); and (8) that Plaintiff and other

Bangladeshi employees were required to work at positions beneath their level, such as busboy instead of waiter, on holidays, (Pl. Dep. 123:10-125:6); (9) that lighter-skinned employees were kept in positions where they would be more visible to guests, (Pl. Dep. 125:4-7); and (10) that chief engineer Mena changed Plaintiff's pay rate in the computer system, but when Plaintiff reported the incident to Human Resources, Mena was forced to correct the pay rate and apologize to Plaintiff.  (Pl. Dep. 135:6-136:10, 137:1.)

These allegations do not provide a sufficient basis upon which a reasonable jury could find Defendant liable to Plaintiff for his hostile work environment claim because: (1) much of the alleged conduct is time-barred and thus not actionable, and Plaintiff has not established that the "continuing violation" exception to the statute of limitations applies; (2) Plaintiff has not demonstrated that Defendant can be held vicariously liable for the conduct of Plaintiff's coworkers; (3) the alleged conduct is insufficiently severe or pervasive; and (4) Plaintiff has not shown the conditions of his employment were altered.

### 1. Time Barred Complaints

The statute of limitations for hostile work environment claims under the NJLAD is two years.  *See Helmi*, No. L-2398-06, 2010 WL 4861443 at *4 (N.J. Super. Ct. App. Div. Dec. 1, 2010) (citing *Montells v. Haynes*, 133 N.J. 282, 292 (1993)).  As discussed above, the bulk of Plaintiff's complaints concern his treatment by coworkers between 2002 and 2008.  (*See* Pl. Dep. 29:14-30:25, 102:19-23, 110:15-24, 126:13-128:23, 129:17-131:21.)  Thus, the ability to bring claims based upon the bulk of those incidents lapsed before he filed his Complaint on October 15, 2010.

Further, contrary to Plaintiff's arguments, his complaints do not fall within the continuing violations theory, which allows a claim to proceed if one of a "series of acts, which together

created the hostile environment" occurred within the statutory period. *Helmi*, 2010 WL 4861443 at *4. Here, Plaintiff failed to show a relationship between the alleged conduct that occurred before the statute of limitations and that which occurred within the statutory period. *See id.* at *5 (finding no continuing violation where the plaintiff was unable to show the incidents were "consistent, persistent, or unrelenting throughout this time" but rather were "isolated and infrequent"). With the exception of Plaintiff's allegation that Hortado called him names during an argument which possibly occurred in 2008,[6] potentially within the two-year statutory period, Plaintiff fails to identify dates, or even years, that the alleged events—the name calling, denial of his request for a different name tag, assignment of unfavorable shifts and job assignments on holidays, requests to do jobs outside his responsibilities, use of a different employment agency, keeping lighter-skinned employees in more visible positions, and Mena changing his pay rate— occurred. Rather, he merely refers to them as occurring during the period of time following September 11, 2001. (56.1 Statement ¶¶ 54-60.) Further, the incidents that were actually brought to management's attention were addressed and thus, undercut a reasonable juror's ability to find pervasive discrimination throughout Plaintiff's employment. Accordingly, as Plaintiff has failed to provide evidence upon which a reasonable juror could find that many of the events upon which he relies to establish a hostile work environment claim fall within the statutory limitations period and he has not presented sufficient facts from which a reasonable jury could find a continuing violation, his hostile work environment claim fails.

---

[6]     Plaintiff alleges this incident occurred in either 2007 or 2008. (56.1 Statement ¶ 60; Pl. Dep. 131:11-132:5.)

### 2.  Vicarious Liability

For an employer to be liable for a hostile work environment, a plaintiff must show that the offending conduct was done by a "supervisor who was acting as the defendant's agent under traditional agency principles."  *Entrot v. BASF Corp.*, 359 N.J. Super. 162, 171 (App. Div. 2003).  The "mere title of manager or supervisor does not by itself suffice to impute that employee's knowledge or actions to the employer."  *Cavuoti v. NJ Transit Corp.*, 161 N.J. 107, 123 (1999) (internal quotations and citations omitted).  Rather, whether an individual constitutes a supervisor for the purposes of imputing liability on the defendant employer depends on whether the plaintiff believed that the offending employee had the authority to negatively affect the plaintiff's working life, such as the power to terminate and demote the plaintiff, to affect compensation, and to control work functions.  *Entrot*, 359 N.J. Super. at 181. Plaintiff's supervisors at the time of his termination were Widito, Trata, and Wolford, none of whom Plaintiff alleges made discriminatory remarks.  (56.1 Statement ¶ 9; 56.1 Counterstatement ¶ 9.) Moreover, there is no evidence in the record from which a reasonable jury could find that Conca, Floody, McNamara, or Hortado, the individuals who are alleged to have repeatedly used racial epithets, had the ability to terminate or demote Plaintiff or affect his pay or work duties. Although Floody is identified as the beverage and nightclub manager, the fact that he had that title, without more, fails to demonstrate he had the authority to hire, fire, discipline, or control Plaintiff's wages, hours, or working conditions such that Defendant would be liable for the offensive name calling Plaintiff attributes to him.  *See Cavuoti*, 161 N.J. at 123-24 (citing *Ulrich v. K-Mart Corp.*, 858 F. Supp. 1087, 1093 (D. Kan. 1994) and *Hunter v. Countryside Assoc. for the Handicapped, Inc.*, 723 F. Supp. 1277, 1278 (N.D. Ill. 1989)).  Thus, a reasonable jury could not find that these individuals were Plaintiff's supervisors or that Defendant would be liable for

29

their conduct.  Had the record showed that the statements were made within the statute of limitations and had the record showed that these individuals were Plaintiff's supervisors, the outcome may have been different.  *See Cutler v. Dorn*, 196 N.J. 419, 440 (2008) (finding a supervisor's degrading comments about the plaintiff's faith and ancestry directly aimed at plaintiff may be a basis to hold the employer liable for hostile work environment).  As Plaintiff's supervisors did not make the derogatory comments and as he attributed the remarks only to his co-workers, Defendant is not liable to Plaintiff for the creation of a hostile work environment under traditional agency principles.

### 3.  Severity or Pervasiveness

When evaluating the severity or pervasiveness requirement of a hostile work environment claim, a court examines all the circumstances such as "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Heitzman v. Monmouth Cnty.*, 321 N.J. Super. 133, 147-48 (1999) (holding "sporadic" and "casual" comments that did not physically threaten, humiliate or alter the plaintiff's "work performance" were not severe or pervasive); *see also Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005); *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993).  The conduct itself is what must be severe or pervasive, not the impact on the plaintiff or the work atmosphere.  *Lehmann*, 132 N.J. at 606.

Although it is unclear from the record how often Plaintiff's coworkers used ethnic epithets, the references to Plaintiff as "Indian," "terrorist," and "Arab," are certainly offensive and inappropriate, and show "lack of racial or ethnic sensitivity."  *Russo v. Ryerson*, Civ. No. 01-CV-4458 JLL, 2006 WL 477006 at *15 (D.N.J. Feb. 28, 2006) (finding a supervisor's use of the

word "ginzo", "while discourteous" was not sufficient to meet the severity or pervasive

requirement of the NJLAD); s*ee also Fabrikant*, 2008 WL 281690 at *6 (citing *Heitzman*, 321

N.J. Super. at 147) (stating that an anti-employment discrimination law is not meant to be "a

general civility code for conduct in the workplace") (internal quotation marks omitted).  It is

undisputed that Plaintiff never told management about these remarks and that, when he brought

problems he encountered to management, his complaints were addressed.  The sole request he

made that was denied involved his request to change or omit portions of his name on his name

tag.  Nothing in the record sheds light on why the request was denied, but it is logical to infer

that an employer requires name tags so that its guests can identify employees they encounter.

Furthermore, encouraging employees to conceal their ethnicity or religion could in fact be

viewed as inconsistent with an equal employment opportunity workplace.  Moreover, Plaintiff's

request would not have addressed the attitude of Plaintiff's coworkers who already knew his

name and would not have addressed the conduct about which he now complains.  Thus, the

denial of this request does not provide a basis for the employer to be found to have hosted a

hostile work environment.

 As to the matters concerning work assignments, Plaintiff's own testimony shows that he

did not view decisions about assignments as being based on his ethnic background.  Rather, he

testified that they were based on a personal relationship between the person making the

assignments and the person who received them.  (Pl. Dep. 126:13-129:13.)  Thus, protected

characteristics were not "the cause of the harassment, [which] is the defining element of a hostile

work environment claim."  *Fabrikant*, 2008 WL 281690 at *6 (internal quotation marks and

citations omitted).  Moreover, even assuming he was asked to perform tasks outside his job

responsibilities, such as bringing ice for the bartender when he was working at room service,

taking room service orders when he was working in the restaurant, handling noise complaints and other security issues, and bringing batteries to the hotel rooms, none of these tasks was inherently demeaning, (see Pl. Dep. 119:11-121.13; 160:22-163:7), and he was positively recognized for his good work and attitude, including his flexibility, (Ex. F to Wexler Decl.), dependability, (Ex. G to Wexler Decl.), hard work, (Ex. I to Wexler Decl.), and rising to the task at hand. (Ex. H. to Wexler Decl.) The single episode he described that could be viewed as demeaning, namely being asked to tie Floody's shoelaces, if true, was obnoxious, but Floody's behavior does not provide a basis to conclude that Defendant maintained a hostile work environment. (See Pl. Dep. 160:22-163:7.) To the contrary, Plaintiff admitted that he was "embarrassed to tell anybody" about that incident, and Defendant therefore did not receive notice of Floody's conduct. (Pl. Dep. 161:3-5.) and comments described in the record rose to the requisite level of severity or pervasiveness.

### 4. Altered Conditions of Employment

Although a plaintiff need not prove "evidence of actual change in working conditions" to demonstrate a hostile work environment, *Taylor v. Metzger*, 152 N.J. 490, 505 (1998), here Plaintiff's failure to produce evidence showing the complained of actions altered his conditions of employment further undermines his hostile work environment claim. *See id.* at 508 (finding that although demonstration of a change in conditions was not required, a rational factfinder could believe that working conditions were altered when following a supervisor's racist remark, other employees "acted coolly" toward the plaintiff and "created the impression that they had been told to stay away from her"). Plaintiff does not allege that the behavior or events he described altered his supervisors' views of him and in fact, he continued to receive positive evaluations and recommendations for other positions until his termination. (56.1 Statement

¶¶ 14-15; 56.1 Counterstatement ¶¶ 14-15.)  Accordingly, Plaintiff fails to demonstrate the conditions of his employment were altered based on the comments and incidents he described.

### 5.  Anti-Discrimination Policies

Additionally, Defendant had effective preventive and remedial measures in place to address complaints of discrimination, which weighs against a finding of liability.  Although the mere presence of anti-harassment policies does not prove an absence of negligence, "effective preventative mechanisms" demonstrate "some evidence of due care" by the employer.  *Lehmann*, 132 N.J. at 621.  To avoid liability, the policies cannot merely be present but must be "backed up by consistent practice."  *Id*.  A company will be less apt to be liable for a hostile work environment claim if it has "policies reflecting a lack of tolerance for harassment" such as "periodic publication to workers of its anti-harassment policy; an effective and practical grievance process; and training sessions for workers, supervisors, and managers about how to recognize and eradicate unlawful harassment."  *Cavuoti*, 161 N.J. at 121.

Here, Defendant had a published policy against discrimination that Plaintiff acknowledged that he received.  (56.1 Statement ¶¶ 2, 4; 56.1 Counterstatement ¶¶ 2, 4.) Further, as discussed in Section III.B.1 *supra*, Defendant demonstrated that it did not tolerate harassment by responding to Plaintiff's complaints against Thompson, Hortado, and Mena. Although Plaintiff alleges that other employees also made discriminatory comments, Plaintiff admits he did not report them and thus, Defendant did not know about these comments and could not take action.  *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998) (holding an employer should not be held responsible when its employee "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer").  As Defendant had effective anti-harassment policies in place and responded to complaints brought to its attention, a

reasonable jury could not find Defendant liable on a hostile work environment claim based on allegedly discriminatory comments made by his coworkers that Plaintiff did not report.

**IV. CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted and Plaintiff's Cross-Motion for Summary Judgment is denied.  An appropriate order will issue.

*/s/ Faith S. Hochberg*
**Hon. Faith S. Hochberg, U.S.D.J.**